IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-955 T and 05-954 T
(Consolidated on February 22, 2006)
(Judge Loren A. Smith)

UNICO SERVICES, INC. and D. GORDON POTTER,

Plaintiffs

v.

THE UNITED STATES,

Defendant

**NOTICE OF DECISION**

Plaintiffs cited the Court of Federal Claims decision, *Coltec Industries, Inc. v. United States*, 62 Fed. Cl. 716 (2004), in their Reply to Defendant's Response to Plaintiffs' Motion for Leave to File Second Amended Complaint and Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss, filed on June 26, 2006. The United States, in a sur-reply brief filed on July 11, 2006, with the Court's permission, noted that the *Coltec* decision was pending on appeal. On July 12, 2006, the United States Court of Appeals for the Federal Circuit issued a decision in *Coltec Industries, Inc. v. United States*, No. 05-5111. A copy of that decision is attached for the Court's convenience.

Respectfully submitted,

s/Jennifer P. Wilson
JENNIFER P. WILSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6495
FAX (202) 514-9440
jennifer.p.wilson@usdoj.gov

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/Steven I. Frahm
Of Counsel

July 14, 2006

# United States Court of Appeals for the Federal Circuit

05-5111

COLTEC INDUSTRIES, INC.,
Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Stephen D. Gardner, Kronish Lieb Weiner & Hellman LLP, of New York, New York, argued for plaintiff-appellee. With him on the brief were William H. O'Brien, Ann-Elizabeth Purintun, Stephen A. Wieder, and Clint E. Massengill.

Judith A. Hagley, Attorney, Tax Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Eileen J. O'Connor, Assistant Attorney General; Richard T. Morrison, Deputy Assistant Attorney General; Gilbert S. Rothenberg and Richard Farber, Attorneys.

Appealed from: United States Court of Federal Claims

Judge Susan G. Braden

# United States Court of Appeals for the Federal Circuit

05-5111

COLTEC INDUSTRIES, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: July 12, 2006

---

Before BRYSON, GAJARSA, and DYK, Circuit Judges.

DYK, Circuit Judge.

In 1996, Coltec Industries, Inc. ("Coltec") reported a capital loss of approximately $378.7 million on its consolidated tax return. This loss was generated by Coltec's selling of high-basis stock for a relatively low price. The Internal Revenue Service ("IRS") disallowed the loss and assessed additional taxes. Coltec paid the assessment and then filed a refund action for $82,803,049 in the United States Court of Federal Claims. That court awarded Coltec a full refund. The United States appealed. We conclude that, although Coltec's claimed capital loss fell within the literal terms of the statute, the transaction that created the high basis in the stock lacked economic substance and therefore must be disregarded for tax purposes. We vacate and remand for a recomputation of the allowable capital loss deduction.

## BACKGROUND

### I

In 1996 Coltec was a publicly traded company with numerous subsidiaries. In that year, Coltec sold one of its businesses, Holley Automotive, Inc., for a gain of approximately $240.9 million. Coltec then met with its tax advisors at Arthur Andersen LLP to discuss, among other things, strategies to offset this gain. Coltec Indus., Inc. v. United States, 62 Fed. Cl. 716, 723 (2004). Arthur Andersen proposed a transaction that had been used in the past to generate capital losses. The transaction essentially involved three steps. First, the parent company would reorganize a dormant subsidiary into a special purpose entity. Second, the parent would transfer property and contingent liabilities to the newly reorganized subsidiary in exchange for stock in that subsidiary. Finally, the parent would sell the stock to a third-party for a nominal sum. The parent would treat its basis in the stock as equal to the property it transferred to the subsidiary but not reduced by the liabilities the subsidiary assumed. The parent would then suffer a significant loss from the sale of the stock because the sale price of the stock would be drastically lower than its basis.

Coltec found Arthur Andersen's proposal appealing. For one thing, Coltec had contingent liabilities, namely asbestos liabilities, which were a prerequisite for this type of transaction. For many years, asbestos was widely used in the manufacture of a variety of products. Coltec, 62 Fed. Cl. at 718. Since the 1970s, however, manufacturers and distributors of asbestos products have faced a flood of claims from workers and other individuals who subsequently suffered from asbestos-related diseases. Id. at 719. This growing asbestos litigation had enormous implications for

manufacturers and distributors dealing in asbestos products, costing these companies and their insurers billions of dollars and sending many into bankruptcy. Id. Coltec was at risk from the asbestos problem, as one of its subsidiaries, Garlock, Inc. ("Garlock") and one of Garlock's subsidiaries, Anchor Packing Company ("Anchor") had both previously manufactured or distributed asbestos products. Indeed, by the early 1990s, Garlock and Anchor had been named defendants in 100,000 asbestos cases. Id. at 721. Corporate veil-piercing claims were not uncommon in asbestos cases.

Coltec decided to implement the Arthur Andersen proposal, and has admitted that tax avoidance was one of its reasons for doing so. Coltec's first step was to rename one of its dormant subsidiaries, Pennsylvania Coal and Coke, Inc., the "Garrison Litigation Management Group, Ltd." ("Garrison"). Coltec caused Garrison to issue 99,800 shares of common stock and 1,300,000 shares of Class A stock to Coltec in exchange for a payment of $13,998,000. In a separate transaction, Garrison issued 100,000 shares of common stock to Garlock (representing approximately a 6.6% interest in Garrison), and assumed all the managerial responsibilities for handling the asbestos related claims against Garlock. Garrison also assumed, and agreed to indemnify Garlock against, all losses and liabilities incurred in connection with asbestos-related claims against Garlock.[1] Garlock transferred to Garrison all outstanding Anchor stock, certain records and insurance policies relating to asbestos liabilities, and furniture. Garlock also transferred to Garrison a promissory note from one of its other

[1] Garrison did not directly assume the asbestos liabilities of Anchor. However, Garrison did agree to indemnify Garlock from all future asbestos-related claims, which would include veil-piercing claims against Garlock based on Anchor's asbestos liabilities.

subsidiaries, Stemco, Inc., in the amount of $375 million.[2] Garlock agreed to advance further funds as needed (up to $200 million) to cover Garrison's capital needs.

Coltec explicitly admits that Garrison's assumption of the asbestos liabilities was in exchange for the Stemco note. Coltec's Br. at 39 ("Garrison received the Stemco note in exchange for assuming Garlock's asbestos liabilities."). In fact, the $375 million amount was calculated to cover the estimated future asbestos liabilities of Garlock, including the Anchor liabilities. Coltec obtained a range of liability estimates from the combined work of two consulting firms. The consulting firms estimated the projected gross future liabilities and the potential insurance coverage. One of the estimates provided by the firms was $371.2 million, which Coltec deemed to be a "high" estimate of the net future asbestos liabilities. Ultimately, the $375 million figure was adopted. See J.A. at 2302 (memo from Arthur Andersen to Coltec stating "[t]he settlement, judgment and litigation costs [of future asbestos related claims], net of [ ] assets and insurance coverage are currently estimated to be $375 million"). Thus, Garrison assumed responsibility for Garlock's potential asbestos liabilities in exchange for a promissory note in the amount of approximately $375 million.

The third and final step involved Garlock's sale of its newly-acquired Garrison stock. On December 20, 1996, as previously contemplated, Garlock sold all of its

[2] Stemco was indebted to Garlock, but rather than have Stemco transfer the promissory note directly to Garlock, Garlock had Stemco transfer the note to Garrison. See J.A. at 7318-19; Coltec's Br. at 51. The reason for utilizing a note from another entity was so that Garlock's basis in the note would be $375 million rather than zero. If Garlock had issued its own promissory note to Garrison, then Garlock's basis in that note would be treated as zero by the IRS because Garlock incurred no cost in making the note. See Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 3.06[4][b] at 3-35-3-36 & n.127 (7th ed. 2002).

100,000 shares of Garrison stock to two banks for $500,000. The amount received was only slightly greater than half the transaction costs for establishing Garrison. As a condition of this sale, Coltec agreed to indemnify the banks against any veil-piercing claims for asbestos liabilities. Coltec, after this transaction, continued to own 93% of Garrison.[3]

In its consolidated tax return for 1996, Coltec asserted that Garlock's basis in the Garrison stock was $379.2 million (representing the $375 million Stemco note plus the other property given to Garrison valued at approximately $4 million, but not reduced by the liabilities assumed by Garrison). Thus Garlock claimed to suffer a $378.7 million loss when it sold the stock for only $500,000. This $378.7 million loss more than offset Coltec's gains for that tax year. The unused loss was carried forward to offset gain in future tax years. Significantly, the loss was recognized only for tax purposes and not for book purposes, and the loss was not reported on the taxpayer's public financial reports.

II

Understanding how tax benefits could be claimed to result from this three-step transaction requires a review of the statutory scheme. It is undisputed that the underlying transaction between Garlock and Garrison—which resulted in Garlock's claiming a high basis in the Garrison stock—is governed by 26 U.S.C. § 351. Section 351(a) provides that certain transactions that involve controlled corporations will be tax-free. Specifically, when property is transferred to a controlled corporation solely in

[3] Two years later, Coltec sold 45,000 of its Garrison shares to attorneys in regional defense firms involved in asbestos litigation.

exchange for stock in that corporation, then in general no gain or loss is immediately recognized. 26 U.S.C. § 351(a) (1996).

The critical question here is the basis for the stock. In a simple property-for-stock exchange under § 351, § 358(a)(1) provides that the transferor's basis of the stock received will be equal to the basis of the property transferred. 26 U.S.C. § 358(a)(1) (1996). However, a transaction under § 351 can become more complicated if, for example, in addition to receiving stock, "money" is also received from a controlled corporation. In such cases, the transferor's basis in the stock received is no longer simply equal to the basis of property transferred. Instead, the transferor's basis in the stock received is equal to the basis of the property transferred <u>decreased</u> by the "money received" by the transferor though increased by the amount of gain recognized. § 358(a)(1)(A). The central statutory dispute here is whether the assumption of Garlock's liabilities by Garrison constituted "money received" by Garlock. If it did, then Garlock's basis in the stock would have to be reduced by the amount of the liabilities assumed.

Under the tax code, "liabilities" that are assumed in a § 351 exchange generally must be treated as "money received" by the transferor for basis purposes. 26 U.S.C. §§ 358(a)(1)(A), 358(d)(1). However, § 358(d)(2) provides an exception to this general rule, excluding as "money received" for basis calculation purposes "the amount of any liability excluded under section 357(c)(3)." As will be explained in greater detail below, Coltec's primary theory is that Garlock did not have to decrease its basis in its Garrison stock by the amount of liabilities Garrison assumed, because these liabilities fell under the § 358(d)(2) exception and thus escaped "money received" treatment. On the other hand, the government contends that the § 358(d)(2) exception is not available to Coltec.

III

Upon audit, the IRS disallowed the $378.7 million loss and assessed a tax liability for the year 1996 in the amount of $82,708,152. Coltec paid the assessment and sued for a refund in the Court of Federal Claims. The government contended that the loss should be disallowed because Garlock was not entitled to the claimed basis for the Garrison stock. The government offered three separate theories. First, the government argued that the contingent asbestos liabilities were not excluded from “money received” treatment by § 358(d)(2), because § 357(c)(3) was inapplicable, as it refers to liabilities which would “give rise to a deduction” and the contingent liabilities here would not “give rise to a deduction.” Second, the government argued that the transaction in which Garlock transferred a $375 million note to Garrison in exchange for the assumption of the asbestos liabilities had an improper purpose and should thus result in “money received” treatment under the statutory anti-abuse provision.[4] Finally, the government argued that the transaction in which the note was exchanged for the liability assumption should be disregarded under the general economic substance doctrine with the result that the basis would not be increased by the amount of the Stemco note.

The Court of Federal Claims, after a bench trial, rejected the government’s three arguments. The court held that the liabilities would “give rise to a deduction” under

[4] The anti-abuse provision (26 U.S.C. § 357(b)(1)) provides:
(1) In general.--If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—
(A) was a purpose to avoid Federal income tax on the exchange, or
(B) if not such purpose, was not a bona fide business purpose, then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such

§ 357(c)(3). See Coltec, 62 Fed. Cl. at 743-44.[5] The court also determined that that transaction should not result in "money received" treatment under § 357(b)(1), the statutory anti-abuse provision, because the principal purpose of the transaction was not tax avoidance; rather, it was a bona fide business purpose. Id. at 738-43. The Court of Federal Claims finally rejected the government's alternative argument under the general economic substance doctrine, concluding that the doctrine was unconstitutional as a violation of separation of powers. Id. at 756. The court went on to hold alternatively that the doctrine did not apply to the present case because the transaction had a bona fide business purpose. The government timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We find nothing in the literal terms of the statute that required Garlock to reduce its basis in the stock by the amount of liabilities assumed by Garrison. However, we conclude that the Court of Federal Claims erred in rejecting the long-standing economic substance doctrine and in its application of that doctrine. The underlying transaction between Garlock and Garrison, in which a $375 million note was transferred to Garrison in exchange for the assumption of the contingent asbestos liabilities, had no meaningful economic purpose, save the tax benefits to Coltec. As such, that transaction must be ignored for tax purposes.

---

exchange) shall . . . be considered as money received by the taxpayer on the exchange.

[5] As an alternative ground for allowing the loss, the Court of Federal Claims held that Coltec was not required to reduce its basis in the stock by the amount of contingent liabilities, because the events necessary to establish the fact of the liability had not yet occurred. Coltec Indus., 62 Fed. Cl. at 737-38. The court thus determined that "contingent liabilities" did not qualify as "liabilities" under § 358(d).

I

We turn first to the arguments based on the literal language of the code provisions. Section 358(a) provides that the basis of the property received in a tax-free exchange under § 351, i.e., the stock received by the transferor, "shall be the same as that of the property exchanged . . . decreased by . . . the amount of any money received by the taxpayer . . . ." 26 U.S.C. § 358(a) (emphasis added). Section 358(d)(1) further provides:

> In general.--Where, as part of the consideration to the taxpayer, another party to the exchange assumed a liability of the taxpayer . . . such assumption . . . (in the amount of the liability) shall, for purposes of this section, be treated as money received by the taxpayer on the exchange.

§ 358(d)(1) (emphases added). Thus, a liability transferred by the taxpayer is generally treated as "money received" when calculating the basis of the property received.

A

The Court of Federal Claims held that § 358(d) was inapplicable because "contingent liabilities" are not "liabilities" under the statute. We disagree. The fact that an obligation is contingent upon a particular condition (such as a successful suit in court) does not make that obligation any less of a "liability." Coltec argues that under Brown v. Helvering, 291 U.S. 193 (1934), contingent liabilities are not considered as liabilities for tax purposes. Brown and similar cases cited, in fact, assume that contingent liabilities are liabilities and address when a taxpayer can deduct a liability for income tax purposes, not whether a taxpayer who transfers a liability must adjust its basis in the property it received. See Brown, 291 U.S. at 200-01; see also 26 C.F.R. § 1.461-1(a)(2)(i) (1996) (providing that a liability is "incurred" in the taxable year in which all events have occurred to establish the fact of the liability).

It is widely recognized that when one party in an exchange assumes a contingent liability of another party, that contingent liability, like all other liabilities, forms an integral part of the purchase price in the exchange. See, e.g., Ill. Tool Works, Inc. v. Comm'r of Internal Revenue, 355 F.3d 997, 1003 (7th Cir. 2004); Holdcroft Transp. Co. v. Comm'r of Internal Revenue, 153 F.2d 323, 324 (8th Cir. 1946); cf. United States v. Smith, 418 F.2d 589, 592 (5th Cir. 1969). That a contingent liability assumed by the transferee forms part of the purchase price paid by the transferee reveals that there is no meaningful distinction between contingent and non-contingent liabilities with respect to what is received (i.e., "money received") by the transferor. We conclude that "contingent" liabilities are "liabilities" under § 358(d). This conclusion is further supported by leading tax commentators.[6]

---

[6] Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders (7th ed. 2002), states:

> At the time of a § 351 exchange, it is not ordinarily necessary to determine whether a liability that is assumed by the transferee corporation or to which the transferred property is subject is too contingent to be taken into account or is instead fixed so as to qualify for the exemption of § 357(a); either way, it does not require the recognition of gain. The debt must be properly classified, however, in applying §§ 357(b) and 357(c) (relating to tax avoidance transfers and debt-in-excess of basis, respectively.) If a borderline liability is sufficiently fixed for § 357(b) or § 357(c) purposes, then it would seem that the transferor should be required to reduce (or adjust) his basis in the stock received for the property under §358(a)(1)(A)(ii).

Id. at ¶ 3.10[3], at 3-60 (emphasis added, footnote omitted). See also Lee Sheppard, Cognitive Dissonance on Contingent Liabilities in Asset Acquisitions, 78 Tax Notes 142, 143-44 (1998), stating:

> [A] sound alternative to deferred purchase price adjustments is for the parties to estimate the contingent liabilities at the time of sale, with the seller taking the estimate into income and the buyer adding it to its basis in the purchased assets. This would allow the seller to walk away. Valuing

Consequently, under the general rule, the liabilities assumed by Garrison would be treated as "money received" by Garlock. Thus under the general rule, Garlock's basis in its newly acquired Garrison stock would be decreased by the amount of the contingent liabilities assumed by Garrison.[7]

B

However, there is an exception to this general rule for calculating basis. Section 358(d)(2) provides that § 358(d)(1) "shall not apply to the amount of any liability excluded under section 357(c)(3)." Section 357(c)(3), in turn, states:

> If a taxpayer transfers, in an exchange to which section 351 applies, a liability the payment of which . . . would give rise to a deduction . . . then,

---

> contingent liabilities, although difficult, turns out not to be as difficult as incorporating those estimates into tax rules that are premised on precision and symmetrical results.

[7] Coltec also contends that the addition of §358(h) to the tax code in 2000 supports its position that contingent liabilities are not "liabilities." Section 358(h) provides:

> If, after application of the other provisions of this section to an exchange or series of exchanges, the basis of property to which subsection (a)(1) applies exceeds the fair market value of such property, then such basis shall be reduced (but not below such fair market value) by the amount (determined as of the date of the exchange) of any liability-- (A) which is assumed by another person as part of the exchange, and (B) with respect to which subsection (d)(1) does not apply to the assumption.

26 U.S.C. § 358(h)(1). Section 358(h) explicitly includes "contingent obligation[s]" as "liabilities" under that subsection. 26 U.S.C. § 358(h)(3). Coltec thus argues the inclusion of "contingent liabilities" in § 358(h) means that "contingent liabilities" are not included in § 358(d). However, § 358(h) by its own terms operates only when § 358(d) does not apply. Thus, we find § 358(h) to be of little utility in our analysis even if we were to assume that a 2000 amendment had interpretive value for construing the earlier code provisions involved here.

for purposes of [§ 357(c)(1)], the amount of such liability shall be excluded in determining the amount of liabilities assumed or to which the property transferred is subject.

The government asserts that the liabilities at issue do not fall under § 358(d)(2)'s exception. The government's argument requires that we consider the interaction of four code provisions: sections 358(d)(2), 357(c)(3), 357(c)(1), and 357(b)(1).

i. Application of § 357(c)(3)

In order to fall under the § 358(d)(2) exception, the language of § 358(d)(2) requires that the liability must be "excluded under section 357(c)(3)." The reference to § 357(c)(3) is somewhat odd because § 357(c)(3) is a provision relating to the calculation of <u>gain</u> rather than the calculation of <u>basis</u>, and the rules for gain recognition are themselves complex. Briefly, by virtue of § 351(a) and (b)(1), gain generally need not be recognized in an exempt transaction except to the extent of "money received." But, under § 357(a), "money received" generally does not include liabilities assumed. However, by virtue of § 357(c)(1), when liabilities exceed basis, gain must be recognized to that limited extent. Section 357(c)(3) excludes certain liabilities from subsection (c)(1). Nonetheless § 357(b)(1) provides that (c)(1) is inapplicable and the full amount of the liabilities assumed must be recognized as gain when the assumption of liabilities was principally for tax avoidance or lacked a bona fide business purpose.[8]

The parties first dispute whether the liabilities here "would give rise to a deduction" as § 357(c)(3) requires. The government contends that the liability is not the kind that "would give rise to a deduction" under § 357(c)(3) because § 357(c)(3) only

---

[8] Section 357(c)(2) states that § 357(c)(1) "shall not apply to any exchange . . . to which subsection (b)(1) of this section applies . . . ."

applies where the transferor (here Garlock) transferred both a liability and the underlying business that generated that liability. Because Garlock transferred its asbestos liabilities but kept its core business, the government urges that the liabilities do not fall within the scope of § 357(c)(3). It is true that the central purpose of § 357(c)(3) was to protect taxpayers who transferred the assets of their business along with liabilities of their business (such as accounts payable) from having to recognize gain if the liabilities exceeded the assets. The theory was that the transferor corporation should not have to recognize gain when it had lost the tax deduction that would flow from payment of the liabilities. S. Rep. No. 95-1263, at 184-85 (1978). Section 357(c)(3) "rescue[s] the taxpayer[ ] from this harsh result" because the taxpayer would not be obtaining a tax benefit from the transfer of liabilities. Bittker & Eustice, ¶ 3.06[4][c] at 3-37 & n.131; see S. Rep. 95-1263, at 185-85. However, we find the government's interpretation to be inconsistent with the plain language of § 357(c)(3). Nothing in the plain language of § 357(c)(3) limits the liabilities excludable to only those that were transferred along with an underlying business.[9]

Accordingly, we conclude that § 357(c)(3) does not limit excludable liabilities to only those that were transferred with an underlying business, and that the liabilities here satisfy the "would give rise to a deduction" requirement. In so holding, we join the only

---

[9] The government points to a statement in the legislative history of § 357(c) which states: "In general, liabilities the payment of which would give rise to a deduction include trade accounts payable and other liabilities (e.g., interest and trades) which relate to the transferred trade or business." S. Rep. No. 96-498, at 62 (1979). This statement of legislative history does not suggest that a transfer of a trade or business is a necessary element of the transaction; it merely explains that liabilities that relate to a trade or business are "include[d]" among the liabilities which would give rise to a deduction.

other court of appeals to have considered this exact issue. See Black & Decker Corp. v. United States, 436 F.3d 431, 437 (4th Cir. 2006) ("The prototypical transaction Congress had in mind in drafting § 357(c)(3) may well have been one in which a corporation exchanged liabilities as part of a transfer of an entire trade or business to a controlled subsidiary, but nothing in the section's plain language embraces such a limitation.").

ii. Applicability of § 357(b)(1)'s Anti-Abuse Provision

Section 357(c)(3) states that if the liability qualifies, then "for purposes of [(§ 357(c)(1)], the amount of such liability shall be excluded in determining the amount of liabilities assumed . . . ." (emphasis added). Section 357(c)(1) provides:

> Liabilities in excess of basis.—
> (1) In general.--In the case of an exchange . . . to which section 351 applies . . . if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

Id. (emphasis added). Basically, § 357(c)(1) sets forth a gain-recognition calculation where one of the variables is the "amount of liabilities assumed." Section 357(c)(3) excludes certain liabilities from this gain-recognition calculus.

However, § 357(c)(1) does not apply when an exchange triggers § 357(b)(1)'s anti-abuse provision. 26 U.S.C. § 357(c)(2). Section 357(b)(1)'s anti-abuse provision applies where liabilities are assumed principally for tax avoidance purposes or lack a bona fide business purpose:

> Tax avoidance purpose.—
>
> (1) In general.--If, taking into consideration the nature of the liability and

> the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—
> (A) was a purpose to avoid Federal income tax on the exchange, or
> (B) if not such purpose, was not a bona fide business purpose,
> then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351 or 361 (as the case may be), be considered as money received by the taxpayer on the exchange.

When it applies, the effect of § 357(b)(1) is two-fold. First, it supplants § 357(c)(1) and requires that assumed liabilities be treated as "money received" for purposes of § 351(b), so that the full amount of gain must be recognized to the extent of liabilities assumed rather than merely (as (c)(1) requires) the amount that liabilities exceed basis. Second, it eliminates the § 357(c)(3) exclusion. In other words, § 357(c)(3)'s exclusion may be rendered inapplicable by (b)(1) if there is a principal tax avoidance purpose or an absence of bona fide business purpose.

The government argues that the transaction here falls within § 357(b)(1) because the principal purpose behind the assumption of liabilities by Garrison was to avoid taxes or was otherwise not a bona fide business purpose. Although neither § 358(d)(2) nor § 357(c)(3) (the sections directly involved here) makes a direct reference to § 357(b)(1) (the anti-abuse provision), the government argues that: § 357(c)(3) refers to § 357(c)(1); § 357(c)(1) can only apply when § 357(b)(1) does not apply; and that therefore, § 357(c)(3) cannot apply where § 357(b)(1) applies.

We disagree with the government's construction of these code provisions. These code provisions are not a model of statutory draftsmanship. The real question is what is meant by § 358(d)(2) when it refers to a "liability excluded under section 357(c)(3)." This could have two possible meanings. It could mean that a liability is excluded "under

section 357(c)(3)" if—looking at § 357(c)(3) in a vacuum—the liability is of the type excluded from the § 357(c)(1) calculation. On the other hand, it could mean that the liability is "excluded" only if it is actually excluded from gain recognition under § 357(c)(1) by operation of § 357(c)(3)—that is, if the (c)(3) exclusion is meaningful because §357(c)(1) is operative and not overridden by § 357(b)(1). In essence, the taxpayer urges the former interpretation, and the government urges the latter interpretation. We think the taxpayer's interpretation is the better of the two.

In construing statutory provisions, we appropriately consult dictionaries in use at the time the statute was enacted.[10] See, e.g., Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865, 874 (1999); Am. Express Co. v. United States, 262 F.3d 1376, 1381 n.5 (Fed. Cir. 2001). The use of the term "under" in § 358(d)(2) suggests limiting consideration to (c)(3) itself since the dictionary definition of "under" in this context is "required by" or "in accordance with." Webster's Third New International Dictionary of the English Language Unabridged 2487 (1976). In other words, the dictionary definition of the term "under" suggests looking only to the operation of § 357(c)(3) itself. The section says nothing about excluding liabilities from gain recognition. It deals only with excluding liabilities from the § 357(c)(1) computation. Moreover, we think that Congress likely would have done one of the following if it wished § 357(b)(1) to apply in this situation. On the one hand, it could have made explicit reference to the basis provision of § 358 in § 357(b)(1); instead that section refers only to treating an assumption of liabilities as "money received" for "purposes of section 351 or 361" (which deal only with

[10] Paragraph 2 of § 358(d) was added to the statute by the Revenue Act of 1978, Pub. L. No. 95-600, § 365, 92 Stat. 2736, 2855 (1978).

gain recognition and not basis reduction). Alternatively, Congress could have made explicit reference to § 357(b)(1) in § 358(d)(2) if it intended to require that § 358(d)(2) apply only if § 357(c)(3)'s exclusion was not rendered inoperative by § 357(b)(1). In other words, if Congress wanted the operation of § 357(b)(1) to preclude the benefit of § 358(d)(2), it could have said in § 358(d)(2) something like, "§ 358(d)(1) shall not apply to the amount of any assumed liability excluded under § 357(c)(3) <u>unless the assumption involved a prohibited purpose described in § 357(b)(1)</u>." (The added underscored language would achieve the supposedly desired result.).

We thus conclude that if the liability is excluded by § 357(c)(3) standing alone, then § 358(d)(2)'s exception may be invoked. It does not matter whether the anti-abuse provision of § 357(b)(1) applies and overrides the actual operation of § 357(c)(1). The interpretation we adopt in this respect is identical to the interpretation adopted by the Fourth Circuit in <u>Black & Decker</u>, though we reach this result by a somewhat different interpretive path. We therefore conclude that the liabilities fall within § 357(c)(3); that § 357(b)(1) is not relevant here; and that § 358(d)(2) excludes the liabilities from "money received" treatment. The consequence is that under the literal terms of the statute the basis of Garlock's Garrison stock is increased by the Stemco note and is not reduced by the assumed contingent asbestos liabilities. Ultimately, the taxpayer would not be disqualified from claiming the capital loss.

II

Having concluded that Garlock's loss from the sale of its Garrison stock falls within the literal terms of the statute, we now turn to the government's argument under the general economic substance doctrine. We must first consider the Court of Federal

Claims' holding that "the use of the economic substance doctrine to trump mere compliance with the Code would violate the separation of powers." Coltec Indus., Inc., 62 Fed. Cl. at 756 (internal quotation marks omitted). That holding is untenable. In rejecting the economic substance doctrine, the court failed to follow binding precedent of the Supreme Court and this court and its predecessor court, the Court of Claims.

Over the last seventy years, the economic substance doctrine has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality.[11] This principle has its roots in several Supreme Court cases. For example, in Gregory v. Helvering, 293 U.S. 465 (1935), the Supreme Court disregarded a transaction which complied with the literal terms of the tax code, where the taxpayer, solely to avoid a dividend tax, caused her wholly-owned corporation to transfer stock to a new corporation which then transferred the stock directly to the taxpayer. Id. at 469-70. So too in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331 (1945), the Supreme Court disregarded a transaction where the taxpayer, in order to avoid a large corporate income tax, transferred an asset in the form of a dividend to two shareholders who in turn conveyed the asset to a purchaser who had originally negotiated with the corporation to purchase the asset. Id. at 332. The Supreme Court has continued to embrace principles of economic substance in later cases. See Knetsch v. United States, 364 U.S. 361, 366 (1960) (disregarding a transaction where the taxpayers paid a "fee for providing the façade of 'loans' whereby the [taxpayers] sought to reduce their . . . taxes[,]" because "there was nothing of

---

[11] See, e.g., Bittker & Eustice, ¶ 1.05[2]; Martin D. Ginsburg & Jack S. Levin, Mergers, Acquisitions, and Buyouts, ¶ 609.1 (2004); Jeff Rector, Comment, A Review of the Economic Substance Doctrine, 10 Stan. J.L. Bus & Fin. 173, 173 (2004).

substance to be realized by [the taxpayer] from this transaction beyond a tax deduction"); see also Frank Lyon Co. v. United States, 435 U.S. 561, 583-84 (1978) (allowing a transaction because there was "a genuine multiple-party transaction with economic substance which [was] compelled or encouraged by business . . . realities . . . and [was] not shaped solely by tax-avoidance features . . . .").

The economic substance doctrine has also been repeatedly applied by our predecessor court. For example, in Ballagh v. United States, 331 F.2d 874 (Ct. Cl. 1964), the Court of Claims disallowed a deduction for interest payments because the transaction which gave rise to the interest payment lacked economic substance as it did "not appreciably affect [taxpayer's] beneficial interest except to reduce his tax." Id. at 877-79. Likewise, in Basic Inc. v. United States, 549 F.2d 740 (Ct. Cl. 1977), the Court of Claims disregarded an inter-company transfer of stock because the transfer had no purpose other than to give the parent a transferred basis in the stock, so that the parent could report less taxable gain on its subsequent sale of that stock. Id. at 745-46. See also Rothschild v. United States, 407 F.2d 404, 417 (Ct. Cl. 1969). Further, our own cases have recognized the economic substance doctrine. See Falconwood Corp. v. United States, 422 F.3d 1339, 1349-51 (Fed. Cir. 2005); Terry Haggerty Tire Co., Inc. v. United States, 899 F.2d 1199, 1201 n.2 (Fed. Cir. 1990); Holiday Vill. Shopping Center v. United States, 773 F.2d 276, 280 (Fed. Cir. 1985). The various tax treatises also recognize the doctrine's continued viability.[12]

[12] See Ginsburg & Levin, ¶ 609.1, at 6-205 ("[I]t is clear enough today that a reorganization must satisfy the business purpose requirement . . . ."); Bittker & Eustice at ¶ 1.05[2][b], at 1-21 ("It is often said that a transaction is not given effect for tax purposes unless it serves some purpose other than tax avoidance. The leading case in

There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1290 n.3 (Fed. Cir. 1999) ("[B]oth we and the Court of Federal Claims are bound by the decisions of the Court of Claims, this court's predecessor court."); see also Strickland v. United States, 423 F.3d 1335, 1338 & n.3 (Fed. Cir. 2005).

Despite acknowledging that "the [Supreme] Court has decided tax cases invoking [the economic substance] doctrine," the Court of Federal Claims chose not to follow this precedent because "[a] careful reading of other cases cited by the Government[ ] . . . reveals that the Court resolved the tax question at issue first by looking to the Code and utilized doctrinal language only to further support its conclusion." Coltec Indus., Inc., 62 Fed. Cl. at 753 (emphasis added). We fail to see how the existence of other Supreme Court cases that do not rely on the doctrine undermine the authority of those that do. The Court of Federal Claims also speculated that "the current vitality of the 'economic substance' doctrine certainly is not clear," id., citing to Nebraska Department of Revenue v. Lowenstein, 513 U.S. 123 (1994). We do not read Lowenstein to be revisiting the validity of the economic substance doctrine. To the contrary, Lowenstein noted that "the substance and economic realities" of the transaction at issue supported the Court's conclusion that a trust received "interest" on cash lent to a seller. 513 U.S. at 134. Of course, even if the economic substance decisions of the Supreme Court have been eroded, the Court of Federal Claims would still be required to follow them as

---

this area is Gregory v. Helvering . . . and the theory has had its fullest flowering in the area of tax law . . . .").

binding precedent. Hohn v. United States, 524 U.S. 236, 252-53 (1998); State Oil Co. v Khan, 522 U.S. 3, 20 (1997); Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989).

Even if we were to assume that the decisions of the Supreme Court and our predecessor court recognizing the economic substance doctrine are not binding, we cannot agree that the doctrine is somehow unconstitutional. Even Coltec makes no effort to defend this proposition on appeal. The Court of Federal Claims has cited no authority supporting its determination that the doctrine is unconstitutional. The court cited only one case, Seggerman Farms, Inc. v. Commissioner of Internal Revenue, 308 F.3d 803 (7th Cir. 2002), that even discussed the concept of separation of powers in light of the tax code, and that case simply suggested that separation of powers counsels against finding that a code provision exceeds Congress' taxing authority. Id. at 808 n.8.

The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code. From its inception, the economic substance doctrine has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit. In this regard, the economic substance doctrine is not unlike other canons of construction that are employed in circumstances where the literal terms of a statute can undermine the ultimate purpose of the statute. See, e.g., Wisc. Dep't of Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 230 (1992) (noting that the maxim de minimis non curat lex—that "the law cares not for trifles" or extremely minor transgressions—"is part of the established background of legal principles against which all enactments are adopted"); United States v. Native Vill. of Unalakleet, 411 F.2d 1255,

1258 (Ct. Cl. 1969) ("[W]e may at times construe a statute contrary to its 'plain language' if a literal interpretation makes a discrimination for which no rational ground can be suggested.").

The Supreme Court has explicitly held that when the judiciary goes beyond the literal language of a statute in order to give effect to its purpose, the separation of powers is not violated. In Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353 (1982), the Supreme Court considered whether the Commodity Exchange Act, 7 U.S.C. § 1 et. seq. (1976), which did not explicitly create a private right of action, should be construed to create an implied private right of action to recover damages based on alleged statutory violations. Id. at 356, 369. The petitioners argued that "the judicial recognition of an implied private remedy [would] violate[ ] the separation-of-powers doctrine." Id. at 376. The Court explicitly rejected this argument, noting that:

> Courts . . . are organs with historic antecedents which bring with them well-defined powers. They do not require explicit statutory authorization for familiar remedies to enforce statutory obligations. A duty declared by Congress does not evaporate for want of a formulated sanction. . . . our function is to decide what remedies are appropriate in the light of the statutory language and purpose and of the traditional modes by which courts compel performance of legal obligations. If civil liability is appropriate to effectuate the purposes of a statute, courts are not denied this traditional remedy because it is not specifically authorized.

Id. at 376 (emphasis added) (quoting Montana-Dakota Co. v. Nw. Pub. Serv. Co., 341 U.S. 246, 261-62 (1951) (Frankfurter, J., dissenting)) (internal citations omitted). The Court went on to recognize an implied right of action under the statute, explaining that the statute was enacted in a legal context that historically recognized implied rights of actions. Id. at 375, 381.

Here, the economic substance doctrine is merely a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance. We conclude that there is no basis for holding the economic substance doctrine unconstitutional.

III

Although the Court of Federal Claims found the economic substance doctrine unconstitutional, it went on to hold that the doctrine was inapplicable in any event, relying on the findings that it made in connection with the statutory tax avoidance test. Coltec Indus., Inc., 62 Fed. Cl. at 754. A review of that determination requires us to consider the basic principles of the economic substance doctrine, as well as its applicability to this case.

A. General Principles

The Supreme Court, various courts of appeals, and our predecessor court, have identified a number of different factors pertinent to the determination of whether a transaction lacks economic substance and thus should be disregarded for tax purposes. We understand the economic substance doctrine to incorporate the following principles.

First, although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, Gregory, 293 U.S. at 469, the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality. This principle emerged early on in Gregory, where the Supreme Court disregarded intermediate transfers of stocks as falling outside the tax code because the transfers had "no business or corporate purpose" and performed no "function" other than to

reduce taxes. 293 U.S. at 469. The Supreme Court later explained that "[if] . . . the Gregory case is viewed as a precedent for the disregard of a transfer of assets without a business purpose . . . it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." Higgins v. Smith, 308 U.S. 473, 476 (1940) (emphasis added). Our court and our predecessor court have followed a similar approach. See Terry Haggerty Tire Co., 899 F.2d at 1201 n.2; Holiday Vill. Shopping Ctr., 773 F.2d at 280; Basic Inc., 549 F.2d at 745-46; Rothschild, 407 F.2d at 417; Ballagh, 331 F.2d at 875-76. Several other courts of appeals have adopted similar positions. See Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006); Boca Investerings P'ship v. United States, 314 F.3d 625, 631 (D.C. Cir. 2003); In re CM Holdings, Inc., 301 F.3d 96, 102 (3d Cir. 2002); United Parcel Serv. of Am., Inc. v. Comm'r of Internal Revenue, 254 F.3d 1014, 1018 (11th Cir. 2001).

While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance,[13] a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.[14]

---

[13] See, e.g., Dow Chem. Co., 435 F.3d at 599 (noting that a transaction that has economic substance may nonetheless be disregarded if the taxpayer had no subjective business profit motivation); Ginsburg & Levin, ¶ 609.1, at 6-205; see also Frank Lyon Co., 435 U.S. at 583-84 (holding that a transaction will be honored by the government where "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities . . . and is not shaped solely by tax-avoidance features").

[14] See, e.g., United Parcel Serv. of Am., Inc., 254 F.3d 1014 (refusing to respect a transaction if it lacks economic effect). We think that the rule adopted by the Fourth Circuit and reiterated in Black & Decker—that a transaction will be disregarded only if it

Second, when the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance. In describing the history of the economic substance doctrine, our predecessor court in Rothschild stated, "Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance." 407 F.2d at 411 (quoting Diggs v. Comm'r of Internal Revenue, 281 F.2d 326, 330 (2d Cir. 1960)). Other circuits have similarly held that "[e]conomic substance is a prerequisite to the application of any Code provision allowing deductions [and therefore that] . . . [t]he taxpayer has the burden of showing that the form of the transaction accurately reflects its substance, and the deductions are permissible." In re CM Holdings, Inc., 301 F.3d at 102.[15]

Third, the economic substance of a transaction must be viewed objectively rather than subjectively. The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the economic substance doctrine.[16] While the taxpayer's subjective motivation may be

---

both lacks economic substance and is motivated solely by tax avoidance—is not consistent with the Supreme Court's pronouncements in cases such as Frank Lyon.

[15] See also Kirchman v. Comm'r of Internal Revenue, 862 F.2d 1486, 1490 (11th Cir. 1989); Stewart v. Comm'r of Internal Revenue, 714 F.2d 977, 990-91 (9th Cir. 1983); cf. Dow Chem. Co., 435 F.3d at 599.

[16] See Gregory, 293 U.S. at 469-70; Frank Lyon Co., 435 U.S. at 584; see also Ballagh, 331 F.2d at 875-78 (finding that where the taxpayer obtained a bank loan to prepay all his annual life annuity premiums, and then borrowed from the annuity company itself to pay back the bank loan, the loan payments to the annuity company were not deductible interest payments because that transaction did "not appreciably affect his beneficial interest except to reduce his tax") (emphasis added); Rothschild,

pertinent to the existence of a tax avoidance purpose, all courts have looked to the objective reality of the transaction is assessing its economic substance. See, e.g., Black & Decker, 436 F.3d at 441-42 (noting that economic substance inquiry requires an "objective determination of whether a reasonable possibility of profit from the transaction existed") (internal quotation marks omitted, first two emphases added); Dow Chem. Co., 435 F.3d at 599; In re CM Holdings, Inc., 301 F.3d at 103 (stating that the objective economic substance inquiry is "whether the transaction affected the taxpayer's financial position in any way"); United Parcel Serv. of Am., Inc., 254 F.3d at 1018; Rice's Toyota World, Inc. v. Comm'r of Internal Revenue, 752 F.2d 89, 94 (4th Cir. 1985).

Fourth, the transaction to be analyzed is the one that gave rise to the alleged tax benefit. For example, in Basic Inc., where the taxpayer underwent an inter-company transfer of stock to allow the parent to sell the stock to a third party with little taxable gain, our predecessor court looked for the economic substance of the inter-company transfer of stock—not of the ultimate sale of stock to the third party. 549 F.2d at 745-46. The court explained that if the business purpose of the ultimate sale could be used to justify the unnecessary inter-company transfer, then "all manner of intermediate transfers could lay claim to 'business purpose' simply by showing some factual

---

407 F.2d at 411, 414, 417 (describing the historic economic substance analysis as whether the transaction has "realistic financial benefit" and finding that where the taxpayer borrowed funds to invest in treasury notes with a lower interest rate than the borrowed funds themselves, taxpayer could not deduct interest payments on borrowed funds because "there was neither a possibility nor opportunity of profit to the taxpayer separate and apart from the tax deduction") (emphasis added); Basic Inc., 549 F.2d at 745-47 (finding that where a parent company had its first-tier subsidiary distribute to it all the outstanding stock of a second-tier subsidiary so that the parent could directly sell the stock to a third party and realize less gain, the inter-company transaction should be disregarded because it had no "valid business grounds") (emphasis added).

connection, no matter how remote, to an otherwise legitimate transaction existing at the end of the line." Id. at 745. Similarly, in Ballagh, where the taxpayer obtained a series of loans to prepay annual annuity premiums so that he could characterize his payments as deductible interest, the Court of Claims focused on the purpose for the loan from the annuity company—not the purpose of the initial annuity contract, when evaluating the economic substance of the transaction. 331 F.2d at 878. So also the Fourth Circuit has stated that in economic substance cases, the focus is on "the specific transaction whose tax consequences are in dispute," Black & Decker, 436 F.3d at 441, and the Second Circuit has stated that "[t]he relevant inquiry is whether the transaction that generated the claimed deductions . . . had economic substance," Nicole Rose Corp. v. Comm'r of Internal Revenue, 320 F.3d 282, 284 (2d Cir. 2002). See also ACM P'ship v. Comm'r of Internal Revenue, 157 F.3d 231, 260 & n.57 (3d Cir. 1998). These cases recognize that there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate).

Finally, arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny. The transaction in Gregory is illustrative. There, the Supreme Court found that the transfer of stock from a wholly owned corporation to a newly created corporation and then directly to the taxpayer, lacked economic substance because the "sole object and accomplishment of [the transfer] was the consummation of a preconceived plan, not to reorganize a business . . . but to transfer a parcel of corporate shares to the petitioner" in such a way as to avoid taxes. 293 U.S. at 469. Similarly, our predecessor court in Basic Inc. disregarded an

inter-company transfer of stock whereby a subsidiary, "through its controlling parent, was caused to transfer the property whose sale the parent had decided upon for its own separate purposes." 549 F.2d at 746. The court found it noteworthy that the inter-company transfer was part of a transaction which "was a foregone conclusion that might just as well have been carried out in reverse order . . . ." Id.; see also Frank Lyon Co., 435 U.S. at 575, 583 (in holding that a "genuine multiple-party transaction" had economic substance, the Supreme Court distinguished more "familial" arrangements involving only two parties); United Parcel Serv. Of Am., Inc., 254 F.3d at 1018-19 (finding that a transaction had economic substance because it created "genuine obligations enforceable by an unrelated party" that was not under the taxpayer's control).

B. Application of the Economic Substance Doctrine

Under these principles, Coltec had the burden of proving that this transaction, which admittedly had a tax avoidance purpose, had an economic reality. The Court of Federal Claims held that Coltec had met this burden. The ultimate conclusion as to business purpose is a legal conclusion, which we review without deference, and the underlying relevant facts are in large part undisputed.

In urging that the transaction had economic substance, Coltec focused particularly on its objective to make the company as a whole a more attractive acquisition target as well as on its objective to make other potential target companies view Coltec as a desirable acquirer. Coltec offered two arguments for why the liabilities-note transaction had economic substance in this context: (1) because the creation of Garrison to manage the asbestos liabilities would make Coltec more attractive and (2)

because the transaction would add a barrier to veil-piercing claims against Coltec. Neither of these theories suggests that the transaction at issue has economic substance.

The first asserted business purpose focuses on the wrong transaction—the creation of Garrison as a separate subsidiary to manage asbestos liabilities. Coltec contends that the transaction had an economic purpose because, by having a separate corporation like Garrison manage Garlock's asbestos liabilities, Coltec became more attractive. The following colloquy with John Guffey, Coltec's CEO, is illustrative:

> Q. [Coltec's Counsel:] . . . "[W]hat [effect] if any did a separate corporation like Garrison to manage the asbestos liabilities have on your ability either to be acquired, Coltec be acquired or for Coltec to do the acquiring?"
>
> A. [Mr. Guffy:] Oh, I think . . . that was a real plus to us. . . . [W]e could talk to the investment community about what we were doing with asbestos, how we were managing it, how we looked at quantifying it, what it meant to us in their time frame. . . . [h]aving a separate entity defining the management of it and having experts within that entity to define what they were doing about the management of it, I think proved to be a plus.

Coltec Indus., Inc., 62 Fed. Cl. at 739-40 (emphasis omitted). The Court of Federal Claims also found that "[T]he management and minimization of [the asbestos] liabilities were essential to the continued viability of Anchor and potentially Garlock. Therefore, the conversion of these businesses into corporate form was clearly to serve a bona fide business purpose." 62 Fed. Cl. at 743. (emphasis added) (internal quotation marks omitted).

The government does not dispute that the transfer of management activities may have had economic substance. Government's Br. at 42. The transfer of management activities, however, is not the transaction at issue. Here, just as in Basic Inc., we must

focus on the transaction that gave the taxpayer a high basis in the stock and thus gave rise to the alleged benefit upon sale. That transaction is Garrison's assumption of Garlock's asbestos liabilities in exchange for the $375 million note. Coltec admits that "Garrison received the Stemco note in exchange for assuming Garlock's asbestos liabilities." Coltec's Br. at 39. It is this exchange that provided Garlock with the high basis in the Garrison stock, this exchange whose tax consequence is in dispute, and therefore it is this exchange on which we must focus.

The transfer of the liabilities in exchange for the note is separate and distinct from the fact that Garrison took a managerial role in administering the asbestos liabilities, as demonstrated by the fact that Garrison managed another entity's asbestos liabilities (Anchor's liabilities) without actually assuming Anchor's liabilities. The taxpayer has not demonstrated any business purpose to be served by linking Garrison's assumption of the liabilities to the centralization of litigation management.[17]

Coltec's second argument for why the transaction has economic substance—that the transaction was designed to strengthen Coltec's position against potential veil-

[17] Coltec in its brief argues that "Garrison obtained the right to any 'upside' if the future asbestos liabilities turned out to be less than the High estimate at the time of the contribution . . . ." Coltec's Br. at 49. There is no indication that this was viewed as a business purpose at the time of the transaction. In any event, the nominal amount ($500,000) that the banks paid for the stock – a little more than half of the transaction costs – demonstrates that creating this supposed "upside" potential had no real-world appeal to potential purchasers. Coltec also argues that the transaction created other benefits such as allowing Garrison to recover legal costs from its insurers, to issue settlement checks more quickly, and to negotiate its own vendor contracts. All of these benefits, however, flowed from the creation of Garrison as a separate entity to manage the asbestos liabilities, not from Garrison's assumption of the asbestos liabilities themselves.

piercing claims—focuses on the appropriate transaction but is also unavailing.[18] Coltec argues, and the Court of Federal Claims agreed, that the transfer of the liabilities for the note was designed to strengthen Coltec's core business from veil-piercing claims, because Garrison would serve as another corporate layer between asbestos claimants and Coltec. Coltec correctly points out that the asbestos liabilities of subsidiary companies such as Garlock frequently exceeded the assets of those companies, and that plaintiffs in asbestos liability cases routinely sought to pierce the corporate veil to reach the assets of parent companies. Understandably, this was a matter of considerable concern to parent companies such as Coltec. The problem is that there is no objective basis for suggesting that the assumption of these liabilities by another subsidiary (in this case Garrison) would in any way ameliorate this veil-piercing problem.

In this respect, Coltec relied entirely on the testimony of various Coltec executives about the veil-piercing benefits that they perceived from the Garlock-Garrison transaction. For example, Timothy O'Reilly, who was the head of Garlock's Asbestos Litigation Department and later Garrison's president, explained:

> The principal motive [of the Garrison transaction] was a further building of the corporate veil, isolating the liabilities, getting the asbestos litigation management department or department into a separate subsidiary for the reimbursement possibilities from the insurance carriers . . . . And it was to create within Coltec the asbestos liability box.

J.A. at 7227. Joseph Andolino, Coltec's tax director, stated:

---

[18] Coltec also argues that the transaction had business purpose because it helped to facilitate the later sale of stock by Coltec to regional defense counsel. We agree with the Court of Federal Claims' determination on this issue—that this second sale of stock was too distant in time from the transaction to serve as a legitimate business purpose.

> I felt that incorporating the liability management activities would ameliorate some of the very serious and grave concerns we had about veil piercing. I felt that it added to the story that we had about isolating the liability from the operations of the company.

J.A. at 7040. Further, as the Court of Federal Claims explained, Coltec's CEO, John Guffey "testified that he would have approved the restructuring in any event because of the benefits of protecting the assets of Coltec and Garlock from veil piercing claims." 62 Fed. Cl. at 723.

These subjective views of Coltec's executives, even if credited, as they were by the Court of Federal Claims, are insufficient to establish economic substance. As we have discussed, economic substance is measured from an objective, reasonable viewpoint, not by the subjective views of the taxpayer's corporate officers. Looking at the transaction objectively, there is no basis in reality for the idea that a corporation can avoid exposure for past acts by transferring liabilities to a subsidiary.

The transfer of the liabilities for the note could only strengthen Coltec's defense against veil-piercing if third parties would be obligated to pursue Garrison instead of Garlock. It is perfectly clear that the transaction had no such result. We are not aware of, nor has Coltec brought to our attention, any authority suggesting otherwise. Nor has Coltec pointed to testimony from any third party that there could be such a benefit. The Court of Federal Claims made no such finding, and even Coltec concedes that Garrison's assumption of Garlock's asbestos liabilities did not actually shield Garlock or Coltec from direct liability, conceding that "Coltec could not, of course, effect a release of Garlock's liabilities to third parties." Coltec's Brief at 15 n.9.

Thus the transaction here could only affect relations among Coltec and its own subsidiaries—it has absolutely no affect on third party asbestos claimants. It simply

made a corporate subsidiary a conduit for the payment of asbestos liability claims. As the Supreme Court held in a related context, "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Court Holding Co., 324 U.S. at 334.

Far from making Garrison more attractive to third party acquirers such as the banks here, the assumption of the asbestos liabilities made the Garrison stock less attractive. The banks were willing to acquire Garrison stock from Garlock only by establishing "separate subsidiaries to insulate their banking business from any potential veil-piercing claims" and they insisted on being indemnified by Coltec against veil-piercing claims. Coltec Indus., 62 Fed. Cl. at 728-29; id. at 750.[19] The banks also insisted on keeping the entire transaction confidential. Id. at 751.

We therefore see nothing indicating that the transfer of liabilities in exchange for the note effected any real change in the "flow of economic benefits," provided any real "opportunity to make a profit," or "appreciably affected" Coltec's beneficial interests aside from creating a tax advantage. See supra. Garrison's assumption of Garlock's liabilities in exchange for the Stemco note served no purpose other than to artificially inflate Garlock's basis in its Garrison stock. That transaction must be disregarded for

[19] "[T]he banks sufficiently were concerned about veil piercing that they too formed separate corporations to insulate their main business and required further indemnification from Coltec." Id.

tax purposes. When that transaction is disregarded, the basis in the Garrison stock is unaffected by the Stemco note/assumed liability exchange.

Coltec may nonetheless be entitled to a capital loss deduction because the value of the other property transferred (roughly amounting to $4 million) which formed the basis for the Garrison stock exceeded the sale price of the stock by the banks. We therefore vacate the judgment below and remand for a limited purpose—so that the Court of Federal Claims may determine whether Coltec is entitled to a partial refund based on the sale of stock with a basis of approximately $4 million for a price of $500,000.

CONCLUSION

For the foregoing reasons, the decision by the Court of Federal Claims is vacated and remanded for further proceedings in accordance with this opinion.

VACATED AND REMANDED

COSTS

No costs.